1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   GUILD MORTGAGE COMPANY LLC,

11                         Plaintiff,                  No.

12          v.                                         **COMPLAINT**

13   CROSSCOUNTRY MORTGAGE LLC,

14                         Defendant.

15

16          Plaintiff Guild Mortgage Company LLC (hereinafter "Guild"), by its attorneys, and

17   for its complaint against CrossCountry Mortgage, LLC (hereinafter "CrossCountry"), alleges

18   as follows:

19                              **NATURE OF THIS ACTION**

20          1.      Guild is a residential mortgage lender founded in 1960. It employs loan

21   originators across the country to sell residential mortgage loans to retail consumers. Guild

22   brings this action for tortious interference, unfair competition, conspiracy, and violation of

23   computer crime laws, and seeks injunctive and monetary relief, to remedy the wrongful

24   scheme by CrossCountry, a competing mortgage lender, to systematically, methodically, and

25   purposefully misappropriate nearly all of Guild's Kirkland, Washington branch, including

26   dozens of employees; induce Guild's employees to breach their contracts, duties of loyalty,

27

28

*Complaint - 1*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

and other obligations; interfere with Guild's relationships with current and prospective customers; and misappropriate and use Guild's confidential information in order to unfairly compete with Guild.

2.      CrossCountry conspired with former Guild Kirkland Branch Manager Christopher "Jordan" Flowers ("Flowers"), former Guild Kirkland Senior Loan Officer Cory Flynn ("Flynn"), and former Guild Kirkland Operations Manager Lisa Jolliffe ("Jolliffe") and offered them lucrative employment packages with CrossCountry to persuade other Guild employees to resign from Guild and defect *en masse* to CrossCountry, taking massive amounts of confidential business and client information with them, and diverting loans in process at Guild to be closed at CrossCountry instead. CrossCountry and its co-conspirators orchestrated this mass departure of Guild's entire Kirkland Branch, while Flowers, Flynn, Joliffee and other Kirkland Branch employees were still being paid and employed by Guild. Guild is aware of dozens of individuals who resigned due to the actions of CrossCountry and those three employees.

3.      While Guild's investigation of this wrongful conduct continues, the facts discovered to date demonstrate that CrossCountry encouraged and facilitated efforts by the Kirkland Branch employees to abuse their positions of trust, exploit information they only learned as trusted employees of Guild, breach their contracts, encourage other employees to breach their contracts, instruct other employees to remove Guild's confidential information, interfere with Guild's customer relationships, and brazenly violate their duties of loyalty to their employer, Guild.

## PARTIES

4.      Plaintiff Guild is a limited-liability corporation organized and existing under the laws of California, with its principal place of business in San Diego, California. Guild's sole member is a Delaware corporation named Guild Holdings Company.

*Complaint - 2*

5.     Guild is a residential mortgage lender founded in 1960. It employs loan originators across the country to sell residential mortgage loans to retail consumers.

6.     Guild has been able to achieve success in the industry by establishing a strong reputation for providing valuable services to its borrowers. Guild has expended substantial amounts of money, time, and resources to hire employees that would build on and strengthen Guild's reputation, and to build strong branch offices in key areas across the country.

7.     Defendant CrossCountry is a limited-liability corporation founded in 2003 and organized and existing under the laws of Delaware. It has its principal place of business in Brecksville, Ohio. Upon information and belief based on public filings, CrossCountry's members are citizens of Ohio.

8.     Cross Country is also a residential mortgage lender, and as such, is a direct competitor of Guild.

9.     Upon information and belief, CrossCountry has branch offices across the United States.

## VENUE AND JURISDICTION

10.     Venue is proper in the United States District Court for the Western District of Washington, because the acts and omissions giving rise to the claims (specifically the conduct of CrossCountry) occurred in King County, Washington. 28 U.S.C. § 1391(b)(2).

11.     This Court has jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction) because (1) Plaintiff's sole member is a citizen of Delaware and, upon information and belief based on public filings, Defendant's members are citizens of Ohio, and (2) the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

12.     Guild is a nationwide residential mortgage lender that uses a relationship-based strategy to originate loans. Guild has found success in the mortgage industry through its

*Complaint - 3*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

operations model and organizational structure, which includes a corporate office located in San Diego, California and branch offices located throughout the United States.

13.    Guild's branch offices serve the surrounding areas and mainly contain local sales teams made up of salespeople and operations support staff.

14.    These branch offices are run by Branch Managers, whose duties include overseeing and building the branch operations, recruiting top loan originators, and managing loan processors and operational staff. This includes oversight of Operations Managers and Loan Officers within the branch.

15.    Loan originators are licensed salespeople who source potential borrowers, take loan applications, and quote mortgage rates. Guild's loan originators can have various titles, such as Branch Manager, Senior Loan Officer, Loan Officer, or other titles.

16.    Guild's operations staff helps Guild by preparing and reviewing loan files for completeness and adherence to investor guidelines. The Operations Manager oversees retail operation functions, including the overall quality and integrity of loan files.

17.    Each position plays a pivotal role in Guild's success. As a result, Guild invests substantial money and time developing its employee base.

18.    Guild also invests substantial time and money to develop its confidential and proprietary information.

19.    As one example, Employees in key roles, including Branch Manager, Loan Officer, and Operations Manager, among others, sign various employee contracts with Guild.

20.    Prior to his departure from Guild, Flowers served as Branch Manager in Guild's Kirkland, Washington branch located at 5209 Lake Washington Blvd. NE, Suite 105 (the "Kirkland Branch"). As a condition of Flowers' continued employment, Guild and Flowers executed a Confidentiality and Restrictive Covenant Agreement (the "Flowers Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 1**.

*Complaint - 4*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

21.     Prior to his departure from Guild, Flynn served as a Senior Loan Officer in Guild's Kirkland Branch. As a condition of Flynn's employment, Guild and Flynn executed a Confidentiality and Restrictive Covenant Agreement (the "Flynn Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 2**.

22.      Prior to her departure from Guild, Jolliffe served as Operations Manager in Guild's Kirkland Branch. As a condition of Jolliffe's employment, Guild and Jolliffe executed a Confidentiality and Restrictive Covenant Agreement (the "Jolliffe Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 3**.

23.     The Flowers Confidentiality Agreement, Flynn Confidentiality Agreement, and Jolliffe Confidentiality Agreement are collectively referred to as the "Confidentiality Agreements."  Other Guild employees in the Kirkland Branch signed similar agreements.

24.     Importantly, as a condition of employment, employees are asked to sign agreements which contain numerous confidentiality and loyalty provisions (examples of which include the Confidentiality Agreements). These provisions are meant to ensure that Guild's own confidential and proprietary information is not used against it and that its employees are not working to help competitors to the detriment of Guild while simultaneously employed by Guild.

25.     Guild also uses technology to protect its confidential information. For example, employees receive Guild-owned laptops which are encrypted and have multi-factor authentication for remote access. Guild has perimeter security that consists of firewalls and content filtering to detect any intrusion. Data is also encrypted within Guild's proprietary loan origination system which houses consumer data. Additionally, access to data and information is role-based, meaning that only certain tiers of employees are permitted to view certain data and information. Guild has also implemented numerous policies and procedures which

*Complaint - 5*

address the handling of company and consumer data. Finally, Guild holds frequent trainings regarding security and data protection.

### The Flowers Confidentiality Agreement

26. Paragraph 2.2 of the Flowers Confidentiality Agreement states:

> All Confidential Information is, and shall remain, the exclusive property of the Company. Employee is authorized to use Confidential Information solely to perform Services for the benefit of the Company, and only while Employee is employed by the Company.

27. Paragraph 3 of the Flowers Confidentiality Agreement states:

> As part of the consideration for Employee's employment, Employee agrees that, at all times during the term of his/her employment by the Company, and indefinitely thereafter, Employee will hold all Confidential Information in the strictest confidence, and will not directly or indirectly use, disclose or allow to be disclosed any Confidential Information to any person, firm, or corporation, unless previously authorized for Company business, and for the benefit of the Company. Employee further agrees that he/she will not use any Confidential Information in any manner that may directly or indirectly have an adverse effect on the Company's business or the value of the Confidential information.

28. Paragraph 5 of the Flowers Confidentiality Agreement states:

> Employee agrees that he/she will promptly disclose to the Company any business opportunity of which Employee becomes aware during his/her employment with the Company and (i) which relates to any products or services planned, under development, developed, produced or marketed by the Company or (ii) of which Employee becomes aware in the course of or as a result of his/her employment with the Company. Employee will not take advantage of or divert any such opportunity for his/her own gain, profit or benefit, or any other person or entity without the written consent of the Company.

29. Paragraph 6.1 of the Flowers Confidentiality Agreement states:

> Employee agrees that during his/her employment with the Company Employee will not directly or indirectly divert or attempt to divert any clients, potential clients, or employees of the Company away from the Company, for any reason.

*Complaint - 6*

30.     Paragraph 6.2 of the Flowers Confidentiality Agreement states:

Employee acknowledges and agrees that during his/her employment with the Company, he/she will not, directly or indirectly, compete with the Company in any way, or act as an officer, director, employee, consultant, lender, or agent of any person or entity that is engaged in any business of the same nature as, or in competition with, the business in which the Company is engaged.

31.     Paragraph 8 of the Flowers Confidentiality Agreement states:

Immediately upon the termination of Employee's employment with the Company, for any reason, Employee will return to the Company all documents, data, and other information pertaining to the Company's business, clients, suppliers, products or services, and any other Confidential Information that Employee has in his/her possession or under his/her control; and Employee shall not remove (either physically or electronically) any such documents or information from Company premises or computers.

32.     Paragraphs 2.2, 3, 5, 6.1, 6.2, and 8 of the Flowers Confidentiality Agreement are collectively referred to as the "Flowers Confidentiality and Loyalty Provisions."

## The Flynn Confidentiality Agreement

33.     Paragraph 2.2 of the Flynn Confidentiality Agreement states:

Employee acknowledges and agrees that all Confidential Information … shall remain the exclusive property of the Company. Employee is authorized to use Confidential Information … solely to perform Services for the benefit of the Company. No license, express or implied, to use any of the Company's Confidential Information … is granted under this Agreement.

34.     Paragraph 3.1 of the Flynn Confidentiality Agreement states:

Employee acknowledges and agrees that the Company is entitled to prevent the unauthorized use and disclosure of its Confidential Information … As part of the consideration for Employee's employment and for the compensation being paid to Employee by the Company, Employee agrees that at all times during the term of his/her employment by the Company, and indefinitely thereafter, Employee will hold in strictest confidence, and will not directly or indirectly use, disclose or allow to be disclosed to any person, firm, or corporation, the Company's Confidential Information … unless previously authorized

*Complaint - 7*

by the Company for use in the pursuit of Company business, and for the benefit of the Company.

35.   Paragraph 3.2 of the Flynn Confidentiality Agreement states:

Employee will not at any time use any of the Company's Confidential Information … in any manner that may directly or indirectly have an adverse effect upon the Company's business, nor will Employee perform any acts that would tend to reduce the value of the Company's Confidential Information …

36.   Paragraph 4 of the Flynn Confidentiality Agreement states:

All files, documents, plans, memoranda, notes, lists, records, contracts and other documents or papers (and all copies thereof) relating to the Company's business, including such items stored in computer memories, on computer disks or by any other means, made or compiled by or on behalf of the Employee or the Company or made available to them relating to the Company's business, are and shall be the Company's property and may not be copied or removed from the Company's premises (either physically or electronically), unless expressly approved by a duly authorized representative of the Company.

37.   Paragraph 6.1 of the Flynn Confidentiality Agreement states:

Employee agrees that during his/her employment with the Company, Employee will not directly or indirectly divert or attempt to divert clients' or potential clients' business from the Company, nor will Employee directly or indirectly, solicit, induce or attempt to solicit or induce any employee of the Company to accept employment outside of the Company.

38.   Paragraph 6.2 of the Flynn Confidentiality Agreement states:

Employee acknowledges and agrees that during his/her employment with the Company, he/she will not, anywhere in the world, directly or indirectly, acting individually or as the owner, shareholder, partner, consultant, independent contractor or employee of any entity, compete with the Company in any way, or act as an officer, director, employee, consultant, lender, or agent of any person or entity that is engaged in any business of the same nature as, or in competition with, the business in which the Company is now engaged or in which the Company becomes engaged during the term of Employee's employment.

*Complaint - 8*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

39.     Paragraph 7 of the Flynn Confidentiality Agreement states:

Employee will promptly disclose to the Company any business opportunity of which Employee becomes aware during his/her employment with the Company and (i) which relates to any products or services planned, under development, developed, produced or marketed by the Company or (ii) of which Employee becomes aware in the course of or as a result of his/her employment with the Company. Employee will not take advantage of or divert any such opportunity for his/her own gain, profit or benefit, or any other person or entity without the written consent of the Company.

40.     Paragraph 9 of the Flynn Confidentiality Agreement states:

Immediately upon the separation of Employee's employment for any reason, Employee will deliver to Company all documents, data, and other information pertaining to the Company's business, clients, suppliers, products or services, and any other Confidential Information … that Employee has in his/her possession or under his/her control; and Employee shall not remove (either physically or electronically) any such documents or information from Company premises or computers.

41.     Paragraphs 2.2, 3.1, 3.2, 4, 6.1, 6.2, 7, and 9 of the Flynn Confidentiality

Agreement are collectively referred to as the "Flynn Confidentiality and Loyalty Provisions."

**The Jolliffe Confidentiality Agreement**

42.     Paragraph 2.2 of the Jolliffe Confidentiality Agreement states:

Employee acknowledges and agrees that all Confidential Information … shall remain the exclusive property of the Company. Employee is authorized to use Confidential Information … solely to perform Services for the benefit of the Company. No license, express or implied, to use any of the Company's Confidential Information … is granted under this Agreement.

43.     Paragraph 3.1 of the Jolliffe Confidentiality Agreement states:

Employee acknowledges and agrees that the Company is entitled to prevent the unauthorized use and disclosure of its Confidential Information … As part of the consideration for Employee's employment and for the compensation being paid to Employee by the Company, Employee agrees that at all times during the term of his/her employment by the Company, and indefinitely thereafter, Employee will hold in strictest confidence, and will not directly or indirectly use, disclose or allow to be disclosed to any person, firm, or corporation, the

*Complaint - 9*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Company's Confidential Information … unless previously authorized by the Company for use in the pursuit of Company business, and for the benefit of the Company.

44. Paragraph 3.2 of the Jolliffe Confidentiality Agreement states:

Employee will not at any time use any of the Company's Confidential Information … in any manner that may directly or indirectly have an adverse effect upon the Company's business, nor will Employee perform any acts that would tend to reduce the value of the Company's Confidential Information …

45. Paragraph 4 of the Jolliffe Confidentiality Agreement states:

All files, documents, plans, memoranda, notes, lists, records, contracts and other documents or papers (and all copies thereof) relating to the Company's business, including such items stored in computer memories, on computer disks or by any other means, made or compiled by or on behalf of the Employee or the Company or made available to them relating to the Company's business, are and shall be the Company's property and may not be copied or removed from the Company's premises (either physically or electronically), unless expressly approved by a duly authorized representative of the Company.

46. Paragraph 6.1 of the Jolliffe Confidentiality Agreement states:

Employee agrees that during his/her employment with the Company, Employee will not directly or indirectly divert or attempt to divert clients' or potential clients' business from the Company, nor will Employee directly or indirectly, solicit, induce or attempt to solicit or induce any employee of the Company to accept employment outside of the Company.

47. Paragraph 6.2 of the Jolliffe Confidentiality Agreement states:

Employee acknowledges and agrees that during his/her employment with the Company, he/she will not, anywhere in the world, directly or indirectly, acting individually or as the owner, shareholder, partner, consultant, independent contractor or employee of any entity, compete with the Company in any way, or act as an officer, director, employee, consultant, lender, or agent of any person or entity that is engaged in any business of the same nature as, or in competition with, the business in which the Company is now engaged or in which the Company becomes engaged during the term of Employee's employment.

*Complaint - 10*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

48.     Paragraph 7 of the Jolliffe Confidentiality Agreement states:

> Employee will promptly disclose to the Company any business opportunity of which Employee becomes aware during his/her employment with the Company and (i) which relates to any products or services planned, under development, developed, produced or marketed by the Company or (ii) of which Employee becomes aware in the course of or as a result of his/her employment with the Company. Employee will not take advantage of or divert any such opportunity for his/her own gain, profit or benefit, or any other person or entity without the written consent of the Company.

49.     Paragraph 9 of the Jolliffe Confidentiality Agreement states:

> Immediately upon the separation of Employee's employment for any reason, Employee will deliver to Company all documents, data, and other information pertaining to the Company's business, clients, suppliers, products or services, and any other Confidential Information … that Employee has in his/her possession or under his/her control; and Employee shall not remove (either physically or electronically) any such documents or information from Company premises or computers.

50.     Paragraphs 2.2, 3.1, 3.2, 4, 6.1, 6.2, 7, and 9 of the Jolliffe Confidentiality Agreement are collectively referred to as the "Jolliffe Confidentiality and Loyalty Provisions."

51.     The Flowers Confidentiality and Loyalty Provisions, the Flynn Confidentiality and Loyalty Provisions, and the Jolliffe Confidentiality and Loyalty Provisions are collectively referred to as the "Confidentiality and Loyalty Provisions." Other Guild employees had similar Confidentiality and Loyalty Provisions as well.

52.     On information and belief, CrossCountry was aware that Flowers, Flynn and Joliffe—as well as the other members of the Kirkland Branch—were bound by the above confidentiality and loyalty provisions. These or similar provisions are standard in the mortgage industry; an industry in which success is determined in part by the safeguarding of confidential information and the maintenance of customer relationships. Moreover, CrossCountry has engaged in conduct substantially similar to that described in this complaint

*Complaint - 11*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

on numerous prior occasions, and has previously been sued in for those actions. As just one example, earlier this year, CrossCountry raided a competitor of employees who, acting at CrossCountry's direction, took customer lists and other confidential information. The Judge in that case directed the parties to work out a solution which resulted in the "Stipulation re: Preliminary Injunction" which required, through the use of a computer forensic expert ("Forensic Expert"), the employees who removed the materials to, among other things:

    (a)    Deliver all personal computers, devices, tablets, computers, and cell phones (the "Devices") within 10 days;

    (b)    Provide a list of all cloud accounts and web-based email accounts, plus login credentials, user names, and passwords;

    (c)    Provide login credentials for personal email accounts;

    (d)    Provide a list of names of files they are aware of that are stored on the devices or cloud storage accounts; and

    (e)    Allow a forensic image to be made of all Devices so that the Forensic Expert can identify information obtained by the departed employees at their prior employer.

CrossCountry has a pattern and practice of improperly raiding its competitor's employees, conspiring with those employees to breach their fiduciary and contractual duties, and assisting those employees in removing information from their employers before leaving to join CrossCountry, exactly as happened here. That is part of CrossCountry's business model. CrossCountry was therefore on notice that the conduct it was encouraging and abetting by Flowers, Flynn, Joliffe, and other members of the Kirkland branch would violate the terms of their contracts in addition to their duty of loyalty to their employer.

53.    For the avoidance of doubt, Guild does not allege any misuse, misappropriation, or other misconduct by CrossCountry with respect to trade secrets. Guild

*Complaint - 12*

reserves the right to amend its allegations based on facts revealed upon further investigation or during discovery.

## The Kirkland Employees' Resignations and Guild's Investigation

54.     In the days and weeks preceding the mass resignation from Guild and rehiring by CrossCountry of nearly every employee of Guild's Kirkland branch, Flowers, Flynn and Jolliffe acted as agents of CrossCountry and worked for CrossCountry's benefit and to Guild's detriment, despite continuing to be employed by Guild.

55.     Flowers, Flynn and Jolliffe, and other Guild employees, in active coordination with CrossCountry, engaged in a persistent and repeated course of conduct constituting blatant violations of the Confidentiality and Loyalty Provisions in their Confidentiality Agreements with Guild. Led by Flowers, Branch Manager of the Kirkland Branch, and while still employed by Guild, Flynn, Jolliffe, and other Guild employees coordinated and conspired with CrossCountry, as well as with one another and with other staff members, to recruit and transition nearly all of Guild's Kirkland Branch to CrossCountry. In furtherance of this effort, and while still employed by Guild, Flowers, Flynn, Jolliffe, and other Guild employees took efforts to convert, export, and appropriate a substantial amount of Guild information, data, and other property for the purpose of benefitting CrossCountry and themselves to the detriment of Guild. Information that was taken may have been protected under applicable federal and state laws and regulations, which Guild is duty bound to protect. On information and belief, they continue to utilize such information for the same purpose.

56.     After deciding to leave Guild to join CrossCountry, and while still employed by Guild, employees from the Guild Kirkland Branch took action to utilize Guild information for the benefit of CrossCountry and themselves and to the detriment of Guild; failed to hold Guild's information in confidence; used, disclosed, and allowed to be disclosed Guild information to CrossCountry without Guild's authorization; used Guild's information in a

*Complaint - 13*

manner which had an adverse effect on Guild's business and the value of such information; directed and diverted business opportunities related to Guild's products or services from Guild to CrossCountry; diverted and attempted to divert clients and employees of Guild away from Guild and to CrossCountry; recruited and encouraged employees in the Kirkland Branch to leave Guild and join CrossCountry; took action to compete with Guild while still employed by Guild; acted as agents or employees of CrossCountry while still employed by Guild; and failed to return to Guild all of its information upon termination of their employment; all for the benefit of CrossCountry and themselves to the detriment of Guild in violation of the Confidentiality and Loyalty Provisions and other legal duties.

57.     In early July 2021, virtually the entire Kirkland Branch resigned from Guild and joined its competitor, CrossCountry.

58.     Upon information and belief, CrossCountry intentionally induced Flowers, Flynn and Jolliffe and the other employees of the Kirkland Branch to breach their contractual obligations and duties of loyalty by, among other things, soliciting the Former Kirkland Employees to leave Guild and join them at CrossCountry, and by transferring customers, customer data and other confidential information to their personal accounts for subsequent use for the benefit of CrossCountry.

59.     As of the date of this filing, Guild has essentially lost the entire Kirkland Branch because of CrossCountry and its agents' conspiring, and Guild has suffered substantial harm, including the substantial resources and investment made in the Kirkland Branch and significant disruption to Guild's operations.

60.     Examples of the breaches and improper conduct that Flowers, Flynn and Jolliffe undertook with CrossCountry's cooperation, which have been discovered to date include, but are not limited to, the following:

*Complaint - 14*

(a)     <u>Flowers, Flynn and Joliffe Export Guild Information for</u>
<u>CrossCountry's Benefit Using the Whiteboard Platform.</u> Guild
primarily utilizes Salesforce as its Customer Relationship Management
("CRM") platform. A CRM platform is the tool utilized by a business
to administer its interactions with customers, typically by housing and
analyzing large amounts of information related to customers. Despite
the fact that Guild's primary CRM is Salesforce, in or around early
June 2021, while still employed by Guild, Flowers reached out to his
Transaction Coordinator, Vita Shuman ("Shuman"), and requested that
he be onboarded to a different CRM platform, Whiteboard Mortgage
("Whiteboard"), an alternative to Salesforce which is not widely used
within Guild.

(b)     After setting up his account on Whiteboard, Flowers imported a
massive amount of Guild information to Whiteboard. For example,
Flowers imported three spreadsheets entitled "Cleaned separated
prospect partners-1", "Cleaned Active Partners-1", and "Cleaned
Jordans Leads-1" to Whiteboard. On or about June 4, 2021, Whiteboard
emailed Flowers to confirm that these spreadsheets were ready to be
imported. Collectively, these spreadsheets contained detailed
information concerning hundreds of real estate agents and potential
borrowers of Guild.

(c)     A few days later, Flowers imported another spreadsheet entitled
"Cleaned TBD Transactions" to Whiteboard. On or about June 8, 2021,
Whiteboard emailed Flowers to confirm that this spreadsheet was ready
to be imported. This spreadsheet contained detailed public and non-

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

public information relating to hundreds of potential borrowers who had submitted applications with Guild but where no property address had yet been identified. On June 10, 2021, Whiteboard confirmed that this spreadsheet had been successfully loaded into its platform.

(d)     On June 9, 2021, Whiteboard confirmed that another spreadsheet titled "All Jordan Transactions (Not TBD) UPDATED" had been imported into Whiteboard. This spreadsheet contained detailed public and non-public information concerning numerous pending loan applicants and current borrowers of Guild.

(e)     Despite setting up Whiteboard, Flowers' email records do not show substantial email communications with Whiteboard regarding loan originations at Guild after he began using the Whiteboard platform, as would be expected if Flowers intended to utilize Whiteboard to originate loans for Guild. Instead, Flowers' email communications with Whiteboard largely stopped after he completed the process of onboarding and importing Guild information. On information and belief, Flowers' intention in setting up Whiteboard was to transfer Guild's confidential and proprietary information to CrossCountry while evading detection so the Kirkland Branch loan originators would be in a better position to transition from Guild to CrossCountry.

(f)     Once Flowers' information was successfully loaded into Whiteboard, Shuman worked with other loan officers in the Kirkland Branch to load their respective spreadsheets into Whiteboard as well. These other loan officers included Flynn, Chad Evans, Todd Kentnor, PJ Mooney, Ryan Lee, Kristina Rombakh, and Lisa Phillips, all of whom ultimately

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

resigned from Guild and joined Flowers at CrossCountry. On information and belief, Shuman's efforts were done at the direction of Flowers and in coordination with Flynn, Jolliffe, and the other Kirkland Branch employees.

(g)    While still employed by Guild, Flynn engaged in the same process as Flowers with respect to Whiteboard. Flynn asked his Transaction Coordinator for information which would allow Flynn to be onboarded to the Whiteboard platform. Despite this, like Flowers, Flynn's email records do not show substantial email communications with Whiteboard regarding loan origination after he began using the Whiteboard platform. Instead, Flynn's email communications with Whiteboard largely stopped after he completed the onboarding process. On information and belief, Flynn sought to utilize Whiteboard as a means to export Guild information for use with his new employer, CrossCountry, while evading detection.

(h)    Meetings and Efforts in Preparation for Transition to CrossCountry. While still employed by Guild, Flowers also conspired with CrossCountry to begin preparing the Kirkland Branch to transition to CrossCountry. For example, Flowers set up "transition"-related meetings and virtual calls through the Kirkland Branch employees' personal (i.e., non-Guild) email accounts in the days and weeks leading up to the mass resignations of those employees from Guild in July 2021. On information and belief, the purpose of such meetings was to coordinate the transition of Guild employees and customers to CrossCountry.

*Complaint - 17*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

(i)    On June 29, 2021, prior to the resignation of any Kirkland Branch employees from Guild, CrossCountry's Chief Production Officer, Craig Montgomery, sent an email stating "Thank you for your time and questions today. As promised please see below I think this webinar will provide answers to additional questions you may have" and containing a 60-minute CrossCountry "Recruiting Webinar Recording."

(j)    On June 30, 2021, prior to the resignation of any Kirkland Branch employees from Guild, Flowers emailed the Kirkland Branch a Zoom meeting invite entitled: "IMPORTANT: NEW OPERATIONS CALL TOMORROW 7/1/21 @ 1PM". In the meeting invite, Flowers stated: "I think everyone needs to make this call if possible to meet the transition OPERATIONS team that will be taking care of us during our transition. Please make it a point to make this call."

(k)    On information and belief, Jen Zarzeczny, the Vice President of Corporate Processing for CrossCountry, created the Zoom meeting and was in attendance along with other CrossCountry employees. That this meeting invite was sent only to Guild employees' personal (i.e., non-Guild) email addresses appears to have been no accident, as Shuman had previously sent an email to Whiteboard on or about June 10, 2021 regarding the linking of non-Guild email accounts to the Whiteboard platform, stating: "We are planning to have each LO & team create their own gmail email address. If we can't have both emails associated with the accounts, can we update this to use the new email addresses we are creating?" On information and belief, the purpose of this effort

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

was to assist in the transition to CrossCountry while evading detection by Guild.

(l)   On July 1, 2021, Flowers emailed the Kirkland Branch with additional details, stating: "I am sorry if I haven't made this clear with all the messaging going out, and/or if I've missed anyone on the emails. WE are meeting tonight at 6pm at the office. Everything will be handled at that time, including and (sic) notices that need to be sent out. Look forward to seeing you all at 6pm."

(m)   At 4:15 a.m. on July 2, 2021, prior to the resignations of some of the Kirkland Branch employees from Guild, Flowers emailed the Kirkland Branch, stating: "After you all left I had about an hour long phone call with the Bellevue Branch Manager. He called to ask what happened and to also inform me that there will be a lot of calls to all of you to try and convince you to stay. They will try and say or do whatever it may take to change your minds. I would just say to follow your heart and lean on each other and myself if you have any questions or need anything. I believe in us and I believe now, more than any point leading up to tonight, that we are going to thrive and soar in this new endeavor. We have the tools, the systems, the team, the products, the pricing, the support and the market opportunity to continue to do something special for our clients and our referral partners. I will work on getting a full team text chat up and going tomorrow. We can also use this thread to communicate at any point over the weekend with any questions, thoughts and communications so desired."

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

(n)    <u>Servicing of Clients on Behalf of CrossCountry While Still Employed</u> <u>by Guild</u>. On information and belief, Flowers also transferred loan data and/or worked on loan files for and on behalf of CrossCountry while he was still an employee of Guild. One example included a borrower file where the appraisal was escalated to management for review. Management asked for additional information related to the appraisal. Instead of providing the information, Flowers and Jolliffe improperly denied the loan citing unacceptable collateral and moved the loan to CrossCountry. At 10:52 p.m. on June 18, 2021, Flowers stated to Guild's underwriting department: "I am going to tell these clients and agent to go to their other lender that has them and the property approved at the sales value." Minutes later, at 10:59 p.m., Flowers stated to the borrower's real estate agent: "I do already have an approval and solution for us to get this loan approved and closed and have begun the works of getting the ball rolling with a different investor/lender and I have a call with them on Monday. They have seen the appraisal and already approved that piece. We just need to get the [applicants] underwritten there … I'll have more Monday with our save outlet for this, and it will get closed for us all." Unsurprisingly, that "save outlet" was CrossCountry.

(o)    For another example, on June 28, 2021, an employee of CrossCountry told a loan applicant in an email that "your loan officer, Jordan, will also be available" to assist with the applicant's application. Later, this email was forwarded to Flowers' Guild email address, indicating

*Complaint - 20*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

Flowers is the "Jordan" being referenced in CrossCountry's email. Flowers was still a Guild employee at this time.

(p) <u>Flynn Exports Guild Information Via Personal Email and Seeks to Transition Borrowers to CrossCountry</u>. As to numerous borrowers, Flynn forwarded substantial information to his personal email address. On information and belief, he did this so he would be in a better position to transition such borrowers from Guild to CrossCountry. For example, while still employed by Guild, Flynn forwarded to his personal email address files for numerous borrowers. On information and belief, Flynn also transferred loan files for borrowers to CrossCountry.

(q) For some of the borrowers transferred by Flynn, CrossCountry employees would correspond with the borrowers about their loan applications, then later add Flynn's Guild email address to the email chain. For example, while still employed by Guild, Flynn was added to an email chain between CrossCountry Senior Corporate Loan Processor Matthew Dohner and a borrower regarding a loan application for that borrower. On information and belief, Flynn was added to these email chains because he was already servicing CrossCountry customers despite still being employed by Guild.

(r) These efforts served to create concern and confusion among customers regarding Guild and its business. For example, one borrower transmitted an email to Flynn and other CrossCountry employees on July 10, 2021 which stated: "I was under the impression that you were merging with Guild mortgage. Not changing companies completely.

*Complaint - 21*

I would like you guys to stop my application completely and not run my credit … ”

(s)     Jolliffe Exports Guild Information Via Personal Email. While still employed by Guild, Jolliffe undertook to export Guild information ostensibly for use with her new employer, CrossCountry. On approximately June 13, 2021, Jolliffe appears to have created a new personal email address and began forwarding information from her Guild email account to her personal email account. Jolliffe forwarded at least 64 such emails, which included a substantial universe of Guild information. For example, Jolliffe forwarded to her personal email address all of the following:

   i.     an Excel spreadsheet entitled "Real Applications – Processor to Be Reassigned" with the detailed public and non-public information relating to numerous potential borrowers who had submitted loan applications with Guild;

   ii.    an Excel spreadsheet with the names of 315 appraisers on Guild's approved branch panel list;

   iii.   a "needs list" showing documents required by Guild to continue underwriting a loan for a potential borrower who had submitted multiple loan applications with Guild;

   iv.    an email from an attorney describing how property title was to be held by two potential borrowers who had submitted a loan application with Guild;

   v.     confidential financial information for a potential borrower who had submitted a loan application with Guild;

*Complaint - 22*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

vi.   the loan application number and email address for a potential borrower who had submitted a loan application with Guild;

vii.   an email regarding a potential borrower who had submitted pre-application information to Guild;

viii.   an internal memo developed by Guild's Training Division regarding how to streamline the income verification process for VA loans;

ix.   an internal Guild job aid regarding a specific loan product sold by Guild to Fannie Mae;

x.   an internal Guild job aid and matrix regarding Guild's methodology for calculating non-taxable income;

xi.   an internal Guild job aid regarding the review of solar panel agreements;

xii.   an internal Guild job aid regarding specific funding requirements per loan product;

xiii.   an internal presentation developed by Guild's Loan Products division;

xiv.   a template letter that was developed and used by Guild to verify loan applicants' employment during the loan underwriting process;

xv.   template letters that were developed and used by Guild to provide loan status updates to loan applicants; and

xvi.   other job aids, training materials, and checklists developed and used by Guild to process and underwrite loan files.

*Complaint - 23*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

(t)     On information and belief, Jolliffe utilized and continues to utilize this information to originate loans in her new role with CrossCountry for the benefit of CrossCountry and her and to the detriment of Guild.

(u)     <u>Jolliffe and Others Direct Loan Applications to CrossCountry While Still Employed by Guild</u>. On June 23, 2021, Jolliffe directed Guild to withdraw two pending loan applications where Guild had approved the loans. No further detail was provided as to why the potential borrowers did not accept the loans. On June 30, 2021, Jolliffe directed Guild to cancel six pending loan applications but did not provide any reason for those cancellations. It is now clear that Jolliffe and others were directing loan applications to CrossCountry while still employed by Guild. In total, between June 10, 2021 and Jolliffe's resignation on July 2, 2021, Jolliffe and other Kirkland Branch employees unilaterally withdrew or cancelled 50 pending loan applications with Guild.

**Flowers, Flynn, and Jolliffe's Resignations and the Loss of the Kirkland Branch**

61.     Without prior warning to Guild, during the first weeks of July 2021, virtually Guild's entire Kirkland Branch resigned and joined CrossCountry. This coordinated mass resignation and the evidence which Guild has obtained regarding same demonstrate without question that this was a coordinated effort and conspiracy between Flowers, Flynn, Joliffe, other Kirkland Branch employees, and CrossCountry in breach of numerous duties to Guild.

62.     After their resignations in early July 2021, Guild sent cease and desist letters to three of its former employees—Flowers, Flynn, and Jolliffe. All three failed to respond. CrossCountry sent a response letter to Guild which denied any wrongdoing.

63.     On information and belief, CrossCountry has perfected their scheme and will continue to harm Guild unless stopped.

*Complaint - 24*

**FIRST CAUSE OF ACTION**

**Civil Conspiracy**

64.     Guild hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

65.     On information and belief, Flowers, Flynn, Jolliffe, and the other Kirkland Branch employees were more desirable candidates for CrossCountry if they had an established book of business that they could immediately start processing at CrossCountry.

66.     As such, CrossCountry conspired to encourage Flowers, Flynn, Jolliffe, and the other Kirkland Branch employees to wrongfully remove Guild confidential information and divert business from Guild to CrossCountry, and to encourage other Kirkland employees to do the same.

67.     As discussed above, on or about June 4th, 8th, and 9th, Flowers uploaded spreadsheets to Whiteboard containing respectively: the contact information for numerous real estate agents and hundreds of Guild's potential borrowers; the public and non-public information relating to hundreds of Guild's potential borrowers who had submitted applications with Guild; and detailed public and non-public information relating to numerous pending loan applicants and current borrowers of Guild.

68.     On information and belief, Flowers did this in cooperation with CrossCountry with the intent of pursuing those potential Guild customers at CrossCountry for the benefit of CrossCountry and himself.

69.     On approximately June 13, 2021, Jolliffe appears to have forwarded at least 64 emails to her personal email account, which included a substantial universe of Guild information, s described above.

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

70.     On information and belief, Jolliffe did this in cooperation with CrossCountry with the intent of pursuing those potential Guild customers at CrossCountry for the benefit of CrossCountry and herself.

71.     Flynn likewise forwarded substantial information to his personal email address as to numerous borrowers. On information and belief, he did this so he would be in a better position to transition such borrowers from Guild to CrossCountry.

72.     On information and belief, Flynn did this in cooperation with CrossCountry with the intent of pursuing those potential Guild customers at CrossCountry for the benefit of CrossCountry and himself.

73.     CrossCountry entered into an agreement with Flowers, Flynn, Jolliffe, and the other Kirkland Branch employees pursuant to which it encouraged and enabled them to wrongfully remove Guild Confidential information.

74.     CrossCountry also conspired with Flowers, Flynn, Jolliffe, and the other Kirkland Branch employees to encourage other employees at the Kirkland branch to likewise wrongfully remove Guild confidential information, and to breach the duty and confidentiality provisions of their own contracts.

75.     Flowers, Flynn, Joliffe, and other Kirkland Branch employees owed fiduciary duties to Guild of good faith and loyalty while employed by Guild. These fiduciary duties are reflected in the Confidentiality and Loyalty Provisions.

76.     By engaging in the conduct set forth in the preceding and subsequent paragraphs, Flowers, Flynn, Jolliffe, and the other Kirkland Branch employees, breached their respective fiduciary duties, statutory duties, and/or duties of loyalty to Guild.

77.     CrossCountry actively encouraged Flowers, Flynn and Jolliffe in their previously described conduct, and benefited from the transfer of Guild's confidential information, customers, and employees.

*Complaint - 26*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

78.     CrossCountry played an essential role in the conduct of Flowers, Flynn, Jolliffe, and the other Kirkland employees. None of these employees would have removed confidential information or breached their fiduciary duties were it not for CrossCountry's willing participation in the breach as part of an effort to appropriate the Kirkland branch of Guild's business.

79.     CrossCountry's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Guild, including substantial economic harm in the form of damage to its relationships with its valued customers and employees, the continuing loss of its competitive position, loss of market share, and lost profits, for which Guild seeks compensation by this action.

## SECOND CAUSE OF ACTION

### Tortious Interference with Business Expectancy

80.     Guild hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

81.     Guild had existing economic relationships with each of its existing and prospective borrowers. Each of those relationships benefitted Guild economically and likely would have continued to benefit Guild economically in the future.

82.     CrossCountry was aware of Guild's economic relationships with its existing and prospective borrowers specifically by virtue of the client information they induced Flowers, Flynn, Jolliffe, and other members of the Kirkland Branch to improperly supply to them, and generally by virtue of their understanding of the mortgage lending business and how it operates with respect to client relationships.

83.     Guild is informed and believes that CrossCountry intended to disrupt, and succeeded in disrupting, Guild's business operations and relationships with its borrowers by engaging in the conduct set forth in the preceding and subsequent paragraphs.

*Complaint - 27*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

84.     CrossCountry's interference with Guild's existing and prospective economic relationships with its customers proceeded from an improper motive and by improper means in that it violated established standards within the mortgage profession and sought to harm Guild by appropriating the confidential information and client relationships into which Guild had invested substantial time and expense for CrossCountry's monetary gain.

85.     CrossCountry's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Guild, including substantial economic harm in the form of damage to its relationships with its valued customers, the continuing loss of its competitive position, loss of market share, and lost profits.

## THIRD CAUSE OF ACTION

### Tortious Interference with Contractual Relationships

86.     Guild hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

87.     Guild had valid and enforceable employment Contracts with all former Guild employees referenced herein.

88.     Specifically, Guild was party to the Loyalty and Confidentiality provisions.

89.     At all times, CrossCountry was aware that Guild had valid and enforceable contracts with its employees.

90.     At a minimum, CrossCountry was on notice that it is standard within the mortgage industry for employees to be subject to loyalty and confidentiality agreements, and is aware that it has been sued over their violations in the past.

91.     CrossCountry intentionally induced Flowers to breach the loyalty and confidentiality provisions of his employment contract by, among other things, inducing him to transfer Guild's confidential information to CrossCountry, to divert Guild's clients to CrossCountry, to act as an agent of CrossCountry during his ongoing employment with Guild,

*Complaint - 28*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

and to induce other members of Guild's Kirkland branch to resign and undertake employment with CrossCountry.

92.     CrossCountry intentionally induced Flynn to breach the loyalty and confidentiality provisions of his employment contract by, among other things inducing him to transfer Guild's confidential information to CrossCountry, to divert Guild's clients to CrossCountry, and to act as an agent of CrossCountry during his ongoing employment with Guild.

93.     CrossCountry intentionally induced Jolliffe to breach the loyalty and confidentiality provisions of her employment contract by, among other things, inducing her to transfer Guild's confidential information to CrossCountry, to divert Guild's clients to CrossCountry, and to act as an agent of CrossCountry during her ongoing employment with Guild.

94.     CrossCountry intentionally induced the other employees at the Kirkland Branch to breach the loyalty and confidentiality provisions of their respective employment contracts by, among other things, inducing them to transfer Guild's confidential information to CrossCountry, to divert Guild's clients to CrossCountry, and to act as an agent of CrossCountry during their ongoing employment with Guild.

95.     CrossCountry's interference with Guild's employment contracts proceeded from an improper motive and by improper means in that it violated established standards within the mortgage lending profession and sought to harm Guild by appropriating the confidential information, employee training, and client relationships into which Guild had invested substantial time and expense for CrossCountry's monetary gain.

96.     CrossCountry's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Guild, including substantial economic harm in the form of

*Complaint - 29*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

damage to its relationships with its valued customers and employees, the continuing loss of its competitive position, loss of market share, and lost profits.

## FOURTH CAUSE OF ACTION

### Unfair Competition (RCW 19.86.020)

97.     Guild hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

98.     CrossCountry's acts alleged herein constitute unfair, unlawful and/or fraudulent business acts and practices under RCW 19.86.020 because such acts are forbidden by various state and federal laws, unscrupulous, unfair, injurious to Guild, and contrary to the public interest.

99.     Specifically, CrossCountry caused confusion for consumers whose loans were in progress with Guild, or who had submitted pre-applications with Guild. These consumers continued to use the same loan originator and then suddenly, their loans were diverted from Guild to CrossCountry. As described above, Guild knows of at least one consumer who terminated her loan application upon learning that it was being transferred to CrossCountry. Upon information and belief, CrossCountry also used Guild's confidential information in order to close loans and CrossCountry.

100.    As a direct, proximate, and foreseeable result of CrossCountry's wrongful conduct alleged herein, Guild has suffered, and unless CrossCountry is enjoined from using the wrongfully obtained customer information, will continue to suffer, irreparable injury, including but not limited to wrongful loss of customers to CrossCountry based on their false and misleading actions and use of Guild's confidential information, for which Guild's remedy at law is inadequate.

*Complaint - 30*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

101.    The public interest would be served by granting the relief sought because it clearly favors preventing institutions such as CrossCountry from engaging in and profiting from unfair business practices as described herein.

102.    CrossCountry's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Guild, including substantial economic harm in the form of damage to its relationships with its valued customers and employees, the continuing loss of its competitive position, loss of market share, and lost profits, for which Guild seeks compensation by this action.

## FIFTH CAUSE OF ACTION

### Violation of CA Penal Code 502

103.    Guild hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

104.    On a repeated and systematic basis, Flowers, Flynn, Jolliffe, and other Kirkland Branch employees, acting as CrossCountry's agents, either individually or in conspiracy with one another, have knowingly accessed Guild's databases in violation of their agreements with Guild and without permission, in violation of California Penal Code § 502(c)(7).

105.    Furthermore, the same individuals and CrossCountry, either individually or in conspiracy with one-another, have knowingly used, or caused to be used, Guild's computer services without permission, in violation of California Penal Code § 502(c)(3).

106.    Furthermore, the same individuals, either individually or in conspiracy with one-another, have without permission taken and copied, or assisted in taking and copying, data from Guild's computer system and computer service, and have used the data on that system to divert confidential information to CrossCountry, in violation of California Penal Code §§ 502(c)(1) and (2).

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789

107.     As alleged in more detail herein, these violations have damaged Guild by, among other things, diverting Guild's confidential borrower information to CrossCountry,

108.     Pursuant to California Penal Code § 502(e), Guild is entitled to compensatory and punitive damages, attorneys' fees, injunctive relief, and other legal and equitable relief as prayed for herein.

109.     Respondents have acted with oppression, fraud, and malice toward Guild, entitling Guild to an award of punitive damages in an amount sufficient to deter them from future misconduct.

110.     It is appropriate for this Court to apply California law with respect to this claim, because Guild and certain of its computer systems are located in California, the Plaintiff was harmed in California, and an actual conflict exists between California and Washington law with respect to this issue.

## SIXTH CAUSE OF ACTION

### Injunctive Relief

111.     Guild hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

112.     By reason of CrossCountry's above-described misconduct and continuous scheme to systematically, methodologically, and purposefully pilfer entire groups of Guild's employees at a time and encourage them to use and/or disclose Guild's confidential information, CrossCountry has caused and will continue to cause Guild to suffer irreparable harm for which there is no adequate remedy at law. Money damages cannot adequately compensate Guild for those losses, even if CrossCountry were able to respond in payment of money damages.

113.     Guild is substantially likely to succeed on its claims against CrossCountry due to CrossCountry's pervasive interference with Guild's contracts and business relationships.

*Complaint - 32*

114.    The threat of harm to Guild in the absence of injunctive relief far outweighs the threat of harm to CrossCountry if an injunction is granted. Guild faces substantial, but difficult to calculate, financial loss and loss of good will, whereas the only "hardship" imposed on CrossCountry is to prevent them from reaping any illicit gain or benefit from their misconduct.

115.    For these reasons, and those set forth in the preceding and subsequent paragraphs, Guild is entitled to preliminary and/or permanent injunctive relief. Accordingly, Guild requests that CrossCountry be enjoined from: using, sharing, summarizing, discussing, or communicating in any manner concerning or otherwise making use of any of Guild's proprietary, and/or confidential information, and ordering them to affirmatively identify and return any of Guild's proprietary and/or confidential information under CrossCountry or its current employees' control.

## **PRAYER FOR RELIEF**

WHEREFORE, Guild prays for the following relief:

1.    For preliminary and/or permanent injunctive relief, including but not limited to:

    (a)    Requiring CrossCountry to preserve all confidential, proprietary, or protected Guild information in their possession and any documents or communications related to the allegations set forth herein;

    (b)    Restraining and enjoining CrossCountry, its agents, servants, and employees, and all other persons acting in concert or participating with it from disclosing or utilizing any confidential, proprietary, or protected information obtained from Guild including, but not limited to, the identity and other information of Guild's customers; and/or;

*Complaint - 33*

(c)     Requiring Respondents to return any confidential, proprietary, or protected information or other property or information of Guild wrongfully taken from Guild.

2.     For compensatory and general damages according to proof;

3.     For special damages according to proof;

4.     For consequential damages according to proof;

5.     For punitive and exemplary damages according to proof;

6.     For prejudgment interest at the maximum legal rate;

7.     For costs of the proceedings herein;

8.     For attorneys' fees as provided by statute and by agreement; and

9.     For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Guild hereby demands a trial by jury for all issues so triable.

Dated this 8th day of October, 2021.

HILLIS CLARK MARTIN & PETERSON P.S.

By      *s/ Eric D. Lansverk*
Eric D. Lansverk, WSBA #17218
999 Third Avenue, Suite 4600
Seattle, WA 98104
206.623.1745
eric.lansverk@hcmp.com

Chad S. Hummel (*Pro Hac Vice to be filed*)
chummel@sidley.com
Eric B. Schwartz (*Pro Hac Vice to be filed*)
eschwartz@sidley.com
Taurean K. Brown (*Pro Hac Vice to be filed*)
taurean.brown@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
213.896.6000

*Counsel for Plaintiff Guild Mortgage Company LLC*

*Complaint - 34*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Telephone: (206) 623-1745
Facsimile: (206) 623-7789