

John R. Conley<br>
1 Gojo Plaza, Suite 310<br>
Akron, Ohio 44311<br>
John.Conley@lewisbrisbois.com<br>
Direct: 330.272.0058

**VIA ECF/CM**
The Honorable Michelle L. Peterson
United States Courthouse
700 Stewart Street, Suite 12232
Seattle, WA  98101

      Re:    Guild Mortgage v. CrossCountry Mortgage
               USDC WDWA Case No. 2:21-CV-01376-JCC-MLP

Dear Magistrate Judge Peterson:

      A loan originator's success in the mortgage industry results from relationships.  Originators spend years cultivating relationships with borrowers and referral sources.  Given its value, originators don't leave these names behind when they get a new job.  They bring this information with them instead.  And every day, Guild, one of the largest lenders, takes this information from its new hires.

      Many times, originators and their support staff have worked together for long periods of time and are loyal to one another, and the support staff often follow their originator if s/he changes employers.  Branch movement happens regularly in the industry; and Guild, as one of the nation's largest lenders, onboards full branches regularly.

      When considering a change of employer, it is typical for groups to have questions that the prospective new employer needs to answer to facilitate the group's decision-making. It is typical for any prospective employer to hold information sessions with the group to provide information and guidance as to what the move would entail, and information concerning employment at the new lender. These meetings happen regularly in the industry; and Guild, as one of the nation's largest lenders, conducts these meetings.

      Yet Guild sued CCM for allegedly accepting borrower and referral source data from the relevant employees[1] and facilitating the Kirkland branch's decision to move to CCM as a group. *See Complaint*, paragraphs 1-81. Guild has, in part, characterized CCM's activities as "tortious interference with business expectancies," averring that: "CrossCountry was aware of Guild's economic relationships with its existing and prospective borrowers specifically by virtue of the client information they induced Flowers, Flynn, Jolliffe, and other members of the Kirkland Branch to improperly supply to them, and generally by virtue of their understanding of the mortgage lending business and how it operates with respect to client relationships," and "Guild is informed and believes that CrossCountry intended to disrupt, and succeeded in disrupting, Guild's business operations and relationships with its borrowers *by engaging in the conduct set forth in the preceding and subsequent paragraphs*." *Id*. paragraphs 82-83 (emphasis added).

      Under Washington law a plaintiff must prove five elements to establish a *prima facie* case of tortious interference with a business expectancy, including **that the defendant interfered for an improper purpose or used improper means**. Such interference may be "wrongful" by reason of a statute or other regulation, or a recognized rule of common law, or an **established standard of trade or profession**. *Nw. Ironworkers Health & Sec. Fund v. Rodbusters, Inc.*, No. CV-04-383-RHW, 2006 U.S. Dist. LEXIS 70350, at *13-16 (E.D. Wash. Sep. 28, 2006).

---

[1] Guild asserts, "upon information and belief," that CCM encouraged the relevant employees to take this data. But Guild fails to state any facts in support of its belief.

Here, Guild alleges that CCM's "interference with Guild's existing and prospective economic relationships with its customers proceeded from an improper motive and by improper means **in that [CCM] violated established standards within the mortgage profession** and sought to harm Guild by appropriating the confidential information and client relationships into which Guild had invested substantial time and expense for [CCM's] monetary gain." *Id.*, paragraph 84. Guild argues that CCM violated mortgage industry standards. CCM will respond to this allegation at trial by proving that its conduct met mortgage industry standards.

Under substantive Washington law, evidence of more than one business is required to establish an industry standard. *Swartley v. Seattle School Dist. No.* 1, 70 Wn.2d 17, 21, 421 P.2d 1009 (1966); *Miller v. Staton,* 58 Wn.2d 879, 885, 365 P.2d 333 (1961). "In situations other than products liability actions, generalizations about the relevance of private, nongovernmental standards are hazardous. Each case must be judged on the basis of its own facts and the underlying substantive law. The evidence must, of course, be relevant to be admissible. To be admissible under this rule, industry standards or customs must be just that—standards or customs. The fact that one business or person (other than a party to the case) follows a certain practice may not rise to the level of a standard or custom, and may not be admissible under the instant rule." 5 Karl B. Tegland, Washington Practice: Evidence Law and Practice § 402.18, at 328 (5th ed. 2007). Here, we have two companies operating in the mortgage loan space. If both company's practices related to accepting referral source and borrower data from new hires, hiring branches as groups, and discussing the potential group move with the group, are substantially similar, then such evidence would be far more indicative of the existence of an industry standard.

Guild has agreed to produce a 30(b)(6) designee to discuss its purported policies and procedures related to the above-described topics. Guild will undoubtedly rely on this self-serving testimony to assure the jury that it would not handle things similar to how CCM handled things. But the jury should not be forced to rely on Guild's self-serving testimony alone. CCM should be permitted to conduct targeted discovery as to Guild's *actual practices* related to the above-described topics and present the jury with evidence of industry standards as demonstrated by Guild's *actual conduct.*

Guild's actual practices with respect to accepting referral source and borrower data from new hires, hiring branches as groups, and discussing the potential group move with the group are clearly relevant. The scope of discovery is broad. There is no obligation to demonstrate that an industry standard exists prior to undertaking discovery on same. *Exxonmobil Oil Corp. v. S. Cal. Edison Co.*, 2014 U.S. Dist. LEXIS 196626. Although this discovery is necessarily going to involve the gathering of information about Guild's recruitment and onboarding of a few exemplar branches, there is no other way to compile the necessary information to rebut Guild's assertions.

Sincerely,
**Benjamin J. Stone** and
**John R. Conley** of
LEWIS BRISBOIS BISGAARD & SMITH LLP